# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **OPTIV SECURITY INC.,** ) | |
| **1144 15th Street, Suite 2900** ) | |
| **Denver, CO 80202** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | |
| ) | Case No.: |
| **EZRA MASTERS** ) | |
| **2956 Woodcroft Circle** ) | |
| **Carrollton, TX 75006** ) | |
| ) | |
| **and** ) | |
| ) | |
| **SENSATIONO INC.** ) | |
| **17350 State Highway 249 Suite 220** ) | |
| **Houston, Texas 77064** ) | |
| ) | |
| **REGISTERED AGENT:** ) | |
| **Republic Registered Agent LLC** ) | |
| **17350 State Highway 249 Suite 220** ) | |
| **Houston, Texas 77064** ) | |
| ) | |
| **and** ) | |
| ) | |
| **SENSATIONO, LLC** ) | |
| **30 N Gould Street Suite R** ) | |
| **Sheridan, Wyoming 82801** ) | |
| ) | |
| **REGISTERED AGENT:** ) | |
| **Registered Agents Inc.** ) | |
| **45 E Loucks Street # 301** ) | |
| **Sheridan, Wyoming 82801** ) | |
| **Defendants.** ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff Optiv Security Inc. ("Optiv" or the "Company"), for its Complaint against Ezra Masters ("Masters") and his companies Sensationo Inc. and Sensationo, LLC ("Masters Companies") (collectively "Defendants"), states as follows:

99812757.4

**PARTIES AND JURISDICTION**

1. This is an action seeking relief based on Defendants' violation of Colorado law, federal intellectual property law, and Masters' breaches of his various Agreements.

2. Optiv is a Delaware corporation, operating its principal place of business at 1144 15th Street, Suite 2900, Denver, Colorado 80202. Optiv regularly conducts business in the state of Colorado in its primary offices at 1144 15th Street, Suite 2900, Denver, CO 80202.

3. Upon information and belief, Masters is a resident of Texas.

4. Masters Companies, of which Masters is the sole owner and employee, are companies registered to do business in the states of Texas and Wyoming and Masters is identified as the President and Organizer respectively.

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because at least one claim is based on a federal question; specifically, Plaintiff's cause of action brought pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. and pursuant to Federal Trademark Law.

6. This Court has supplemental subject matter jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over Masters as Masters regularly contracts business in the State of Colorado.

8. This Court has personal jurisdiction over Masters pursuant to his consent to personal jurisdiction of this Court in The Master Subcontract ("Subcontract"). **Exhibit A**, ¶ 15.

9. This Court has personal jurisdiction over Masters Companies as it or its alter ego consented to personal jurisdiction of this Court in the Subcontract. Ex. A ¶ 15.

99812757.4

10. This Court has personal jurisdiction over Masters Companies because Masters Companies holds itself out for business in the state of Colorado and has continued to harm Optiv in the state of Colorado.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and pursuant to the Subcontract. Ex. A ¶ 15.

## GENERAL ALLEGATIONS

12. In October of 2019 Masters and Optiv began discussions for Masters, through Masters Company, to become a contractor of Optiv performing work designing a user interface for Optiv's web platforms.

13. Masters maintains a professional portfolio website which can be found at www.mastersux.com.

## The Agreements

14. To govern and control Masters' work as a contractor for Optiv, Masters and Optiv executed a Master Subcontract Agreement on October 28, 2019. *See* Ex. A.

15. The Master Subcontract specifically defined Confidential Information, and the parties agreed that Confidential Information includes Optiv's:

> business strategies and plans, financial statements and information, marketing plans, merchandising plans, proposals, business forecasts, technologies, sales leads and information, client prospects, research, data, supplier and customer lists, pricing and costs information, employee and shareholder information, data and information required to be kept confidential by applicable laws and regulations, contractual information, ideas, methods of operation, specifications, intellectual property, concepts, processes or products, techniques, designs, sketches, know-how, plans, trade secrets, discoveries, drawings, inventions, and any other information or documentation concerning Optiv and/or one or more of its affiliates, or their clients or suppliers, regardless of whether the same is in written or electronic format or disclosed to Contractor orally.

*See* Ex. A ¶ 12(C).

3

16. In the Master Subcontract, Masters agreed that:

Contractor will not, without written authority from Optiv, disclose to any person or party or use for its own benefit, any such Confidential Information, all such Confidential Information being considered to relate to trade secrets and to be proprietary to Optiv or its affiliates or their clients or suppliers. Contractor agrees not to disclose any Confidential Information to Contractor's employees, agents or contractors except to those employees who are required to have the Confidential Information in connection with the performance of this Agreement.

*See* Ex. A ¶ 12(A).

17. Masters further agreed that he would "not make any copies of the Confidential Information unless the same is approved in writing by Optiv." *See* Ex. A ¶ 12(A).

18. Masters and Optiv specifically contemplated Masters' breach of the Master Subcontract and agreed that "Contractor shall be liable to Optiv for damages arising out of or resulting from Contractor's willful or negligent misconduct in the course of the performance of duties hereunder or other breach of this Agreement." *See* Ex. A ¶ 14.

19. In further contemplation of Masters' work as a contractor for Optiv, Masters and Optiv executed a Mutual Nondisclosure and Intellectual Property Ownership Agreement (the "NDA"). *See* **Exhibit B**.

20. Similar to the Master Subcontract, the NDA defines confidential information as:

any concepts, business models, marketing plans, proposals, business plans, forecasts, financial data, customer and prospect lists and information, personnel data, contract information, properties, methods of operation, software (including, without limitation, source code, specifications, data, works-in-process, alpha and beta versions, design documents and documentation), trade secrets, inventions, discoveries and know-how of the disclosing Party and/or Affiliates, and any discussions relating to all of the foregoing.

*See* Ex. B ¶ 1.

99812757.4

21. Masters agreed in the NDA "not to use any Confidential Information of the other Party for any purpose except for the purpose for which it was disclosed to the receiving Party by the disclosing Party." *See* Ex. B ¶ 2.

22. Optiv and Masters further agreed in the NDA that "Neither Party shall make any copies of the Confidential Information of the other Party unless the same are previously approved in writing by the other Party." Ex. B ¶ 3.

23. Optiv and Masters further agreed in the NDA that "Each Party agrees that it shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the other Party." Ex. B ¶ 3.

24. Optiv and Masters further agreed in the NDA that "Nothing in this Agreement is intended to grant any rights to either Party under any patent, mask work right or copyright of the other Party, nor shall this Agreement grant any party any rights in or to the Confidential Information of the other Party except as expressly set forth herein." Ex. B ¶ 7.

25. As a part of the NDA, Masters "acknowledge[d] that all original works of authorship made by me (solely or jointly with others) within the scope of my engagement with Optiv and which are protectable by copyright are 'works made for hire,' pursuant to United States Copyright Act (17 U.S.C. §§ 101 et seq.), as applicable." Ex. B ¶ 10(b)(i).

26. Specifically, Masters assigned to Optiv all "works for hire" and "inventions" when he agreed that:

> If any such works of authorship or any other Inventions do qualify as a work made for hire, I hereby irrevocably and exclusively assign to Optiv or its nominee, without further consideration or right of compensation, all of my rights, title and interest in and to any Invention (and all Intellectual Property Rights with respect thereto) conceived or made (i) during my engagement; (ii) prior to my engagement with Optiv when working with, for, or on behalf of Optiv in a capacity other than as an employee or consultant or (iii) within one (1) year after termination of my engagement.

*See* Ex. B ¶ 10(b)(i).

27. The Parties agreed in the NDA that Inventions shall mean:

discoveries, improvements, ideas, conceptions, developments, designs, and works of authorship, whether or not tested, reduced to practice, or subject to any form of legal protection, which Individual may conceive or make, individually or along with others, which directly or indirectly (i) relate to matters within the scope of Individual's duties or field of responsibility during Individual's engagement with Optiv or one of its Affiliates; (ii) are based on knowledge of the actual or anticipated business or research and development activity of Optiv or its Affiliates; or (iii) are aided by the use of time, materials, facilities or Confidential Information of Optiv or one of its Affiliates.

*See* Ex. B ¶ 10(a).

### Defendants' Misconduct

28. Following the termination of Masters' contractor relationship with Optiv, Masters began publishing content to his professional portfolio website regarding Optiv and the work he performed for Optiv.

29. Masters' website, www.mastersux.com, contained a tab specifically naming Optiv and included the use of Optiv's name and trademarked logo with US Registration Number 5161762 and US Registration Number 5161694. Both registered marks are identified herein:



US Registration Number 5161762

6

99812757.4

# OPTIV

US Registration Number 5161694

30. On Masters' Optiv tab, Masters included the name, image, likeness, and alleged quotes from three different former Optiv employees giving the impression that these employees and Optiv endorsed Masters' work and use of their name, image, and likeness and had an ongoing relationship with Masters.

31. Also, on Masters' Optiv tab, Masters included screenshots of work he supposedly performed for Optiv, which are accurate photographs of Optiv's current customer portal.

32. The screenshots of the client customer portal clearly qualify as both a "work for hire" and an "invention" that Masters unequivocally assigned to Optiv for exclusive use and disclosure.

33. On June 17, 2024, Optiv sent Masters a Notice to Cease and Desist ("June 17 Cease and Desist") demanding that Masters (1) "cease and desist in your use of all of Optiv's confidential and proprietary information, including the removal of any and all information related to Optiv from your website masterux.com;" (2) "not disclose or possess any Optiv confidential or proprietary information; (3) "destroy all of Optiv's confidential or proprietary information in your possession." Though the June 17 Cease and Desist was dated June 13, it was not delivered to Masters until June 17, 2024. *See* **Exhibit C**, June 17 Cease and Desist.

7

99812757.4

34. The June 17 Cease and Desist clarified that these demands included Masters' "use(s) of [Optiv's] name, logo, trademarks, product information, and employee names, likenesses, and quotes."

35. Masters did not respond to the June 17 Cease and Desist.

36. Sometime after the June 17 Cease and Desist Masters removed from his website some, but not all of the offending conduct that prompted Optiv's June 17 Cease and Desist.

37. Indeed, Masters maintained on his website mastersux.com Optiv's logos and various references. As a result of Masters keeping Optiv's trademarked logos and other references on his website without authorization, Optiv sent another correspondence to Masters on July 15, 2024 (the "July 15 Correspondence"). Though the July 15 Correspondence was dated July 11, it was not delivered to Masters until July 15, 2024. **Exhibit D**.

38. In the July 15 Correspondence, Optiv again renewed its demands that it asserted in the June 17 Cease and Desist. Optiv further demanded that Masters take down Optiv's name and logo from his website mastersux.com. Lastly, Optiv demanded that Masters take down the name and quote of an Optiv employee who did not provide Masters authorization to use either the quote or their image and likeness.

39. Masters responded via email on July 15, 2024, stating that he "[apologized] for the prior oversight" and he had "ensured that all proprietary or confidential information has been removed from my professional portfolio site." **Exhibit E**.

40. Optiv responded via email on July 17, 2024, again demanding that Masters delete any reference to the Optiv employee and to remove Optiv's proprietary logo and name from Masters' website and that the continued presence of such proprietary logos on his website "does

8

not seem that best efforts, or even reasonable efforts, were made to comply with [his] contracts and with [Optiv's] two previous notices." **Exhibit F**.

41. Masters responded via email on July 17, 2024, again providing that he would "review and comply." **Exhibit G**.

42. Despite this assurance, Masters again failed to remove any of the references that were the subject of the July 15 Correspondence and on July 31, 2024, Optiv again followed up with Masters regarding his blatant refusal to cease his infringement of Optiv's trademarks and proprietary logos. **Exhibit H**.

43. Specifically, Optiv attached screenshots of Masters' website demonstrating Masters' infringement including: (1) Masters' continued use of an Optiv employee's name, image, and quotes without permission; (2) the use of Optiv's proprietary trademark logos. Ex. H.

44. Masters responded over the coming days that he would "contact [his] team immediately" and that the references had been taken down. **Exhibit I**.

45. Unfortunately, despite Masters' hallow assurances the items remained on his website for weeks and months.

46. Indeed, on September 18, 2024, Optiv, via its counsel, sent Masters another cease and desist letter ("September 18 Cease and Desist"). **Exhibit J**.

47. The September 18 Cease and Desist recanted the previous correspondences that Optiv sent to Masters demanding that Masters cease and desist from infringing on Optiv's intellectual property and trademarks and misappropriating Optiv's trade secrets and confidential information. Ex. J.

48. Troubling is that as of Optiv's September 18 Cease and Desist Masters' "website shows that even now it is not in compliance with Optiv's demand[s]." Ex. J.

9

99812757.4

49. Optiv again demanded that Masters "remov[e] Optiv's logo and reference to Optiv on the homepage of your website; (2) remov[e] the 'Optiv' tab/link at the top of the homepage on your website; (3) fully deleting that Optiv webpage contained in your website; and remov[e] Optiv's name from any 'testimonials' contained on your website, including, but not limited to, those that appear on the 'Contact Me' part on your site – as Mr. Lyon, Mr. Necaise, and Mr. Prost are no longer with Optiv and thus, again your labeling them as Optiv employees is false. We further demand that you cease and desist from every instance falsely claiming your company has a relationship or affiliation with Optiv in the future." *See* Ex. J

50. Despite these repeated demands and attempts to work with Masters without seeking court intervention, Masters again showed no interest in complying with Optiv's demands.

51. Instead of complying with Optiv's demand and ceasing his infringing, tortious, and unlawful conduct, Masters simply renamed "Optiv" to "OPTion" on his website.

52. On November 8, 2024, Optiv, through its counsel, sent Masters a final cease and desist letter (the "Final Cease and Desist"). **Exhibit K**.

53. In the Final Cease and Desist Optiv made clear that it would be forced to take legal action against Masters if he did not "immediately remove any reference to Optiv from [his] website, remove any Optiv confidential information or any information in general that [he] learned from Optiv from [his] website, refrain from making any reference to Optiv on any such website, and refrain from using, disclosing, or posting any Optiv confidential information or any information in general that [he] learned from or created during [his] time working with Optiv on [his] website now and at any time in the future." Optiv specifically demanded that Masters remove from his website images that illustrated Optiv's confidential client platform and revealed customer identities. Ex. K.

10

54. Most distressing is that as of November 18, 2024, Masters has continued to publicize Optiv's confidential and trade secret information, including, but not limited to, screenshots of Optiv's confidential client portal that identify current Optiv customers. *See* **Exhibit L**.

55. Masters has a duty to keep secret and confidential Optiv's trade secret and confidential information including its customers' identities and its internal processes.

## COUNT I
## BREACH OF CONTRACT
### (MASTER SUBCONTRACT)
### (ALL DEFENDANTS)

56. Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-56 above.

57. On or about October 28, 2019, Masters entered into the Master Subcontract with Optiv through the Masters Company.

58. The Master Subcontract between Optiv and Masters is a valid and enforceable contract in which Masters agreed, among other things, to abide by confidentiality provisions regarding Optiv's Confidential Information.

59. These restrictions are standard and are necessary to protect Optiv's important and legitimate business interests, including, but not limited to, Optiv's Confidential Information and trade secrets.

60. By virtue of the conduct described above, Masters has violated the express terms of the Master Subcontract, specifically the confidentiality provisions contained therein.

61. Specifically, Masters has misappropriated and published Optiv Confidential Information to his website www.mastersux.com.

11

62. Further, Masters misappropriated and published to his website www.mastersux.com Optiv "Work Product," including, but not limited to, user interface designs for Optiv's customer portal.

63. Further, Masters misappropriated and violated the Master Subcontract when he disclosed and published the identities of Optiv's customers on his website www.mastersux.com.

64. As a direct and proximate result of Masters' breaches of the Master Subcontract and other wrongful conduct, Optiv has been irreparably harmed and will continue to be irreparably harmed through the loss of public disclosure of its confidential systems, user interfaces, and identification of customers.

65. Optiv has no adequate complete remedy at law, as Optiv's injuries cannot be fully quantified, and the balance of equities and public interest favor relief against Masters.

66. Optiv is entitled to recover reasonable and necessary attorneys' fees and costs incurred in the prosecution of this lawsuit.

67. Unless Masters is enjoined, his misconduct will continue, and Masters will continue to cause Optiv harm with the ongoing disclosure and publication of its Confidential Information and Trade Secrets.

68. Optiv is entitled to damages, due to Masters' breach to the extent they can be quantified and calculated.

## COUNT II
## BREACH OF CONTRACT
## (NDA)
## (ALL DEFENDANTS)

69. Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-69 above.

12

99812757.4

70. On or about October 29, 2019, Masters entered into the NDA with Optiv, through Masters Company.

71. The NDA between Optiv and Masters is a valid and enforceable contract in which Masters agreed, among other things, to abide by restrictions as to his use and retention of Confidential Information, Masters' rights to works for hire, and Masters' rights to intellectual property.

72. These restrictions are necessary to protect Optiv's important and legitimate business interests, including, but not limited to, Optiv's Confidential Information and trade secrets, other protected commercial information.

73. By virtue of the conduct described above, Masters has violated the express terms of the NDA, including the confidentiality and intellectual property provisions.

74. Specifically, Masters has misappropriated and published Optiv Confidential Information to his website www.mastersux.com.

75. Further, Masters violated the NDA when he misappropriated and published to his website www.mastersux.com Optiv "Work Product," including, but not limited to, user interface designs for Optiv's customer portal that are categorically intellectual property of Optiv.

76. Further, Masters misappropriated and violated the Master Subcontract when he disclosed and published the identities of Optiv's customers on his website www.mastersux.com.

77. As a direct and proximate result of Masters' breaches of his Agreement and other wrongful conduct, Optiv has been irreparably harmed and will continue to be irreparably harmed through the loss of its established clients, employees, goodwill, revenues, and profits; impairment of future earning capacity; and diminution in the value of its business.

13

78. Optiv is entitled to recover reasonable and necessary attorneys' fees and costs incurred in the prosecution of this lawsuit.

79. Unless Masters is enjoined, his misconduct will continue, and Masters will continue to cause Optiv to suffer losses, including the retention, disclosure and impermissible use of its confidential information and trade secrets.

80. Optiv is entitled to damages, for its loss due to Masters' breach to the extent they can be quantified and calculated.

## COUNT III
## VIOLATION OF DEFEND TRADE SECRETS ACT
## 18 U.S.C. § 1836 et seq.
## (ALL DEFENDANTS)

81. Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-81 above.

82. Optiv owns trade secrets and confidential information that derive independent economic value, actual or potential, and are not generally known or ascertainable but through improper means.

83. Optiv takes and has taken reasonable measures to keep such information secret. For example, Optiv maintains its confidential information and trade secrets – such as customer lists and user experience designs – on a protected network which requires company authorization to access, a password is required to access such information, and access is limited to those individuals who require the use of the confidential information and trade secrets as part of their duties or have paid for such access as a customer of Optiv.

84. Optiv's trade secrets are related to cyber security products and services that are used and sold in interstate commerce and the customers who purchase the same.

85. Masters has retained, disclosed, and/or used Optiv's trade secrets through improper means and without the permission of Optiv.

86. Masters has disclosed the identity of Optiv's established customers that he had access to while employed by Optiv publicly on his website www.mastersux.com.

87. As a direct and proximate result of Masters' actions, Optiv has been and will continue to be damaged.

88. Additionally, as a direct and proximate result of the wrongful conduct of Masters, Optiv has been irreparably harmed and will continue to be irreparably harmed through the publication of its confidential customers and unique user experience designs.

89. Unless Defendants are enjoined, this misconduct will continue, and Masters will continue to cause Optiv to suffer losses, including the retention, disclosure and impermissible use of its confidential information and trade secrets.

## COUNT IV FEDERAL TRADEMARK INFRINGEMENT
### (ALL DEFENDANTS)

90. Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-90 above.

91. Without Optiv's consent, Masters has used, in connection with the promotion, advertising, offering for sale and sale of Masters' services, Optiv's name and trademarked logos with US Registration Number 5161762 and US Registration Number 5161694 and ("Infringing Marks") without Optiv's permission and to draw a false association with Optiv.

92. Masters is using the Infringing Marks in connection with the promotion, advertisement, and offering of his various services to profit off of Optiv's reputation as a premiere cyber-security company. By using the Infringing Marks in these promotions, Masters is misleading the public and potential customers into believing that he is actively associated with Optiv.

93. Masters' use of the Infringing Marks creates the commercial impression, and sows confusion amongst customers, that Optiv is affiliated with Masters' offering of services.

94. Maters' use of the Infringing Marks is likely to cause confusion or mistake as to the source, affiliation, or sponsorship of Masters' products and services.

95. Masters' unauthorized use of the Infringing Marks constitutes infringement of Optiv's logo mark, and Masters' acts of trademark infringement have been committed with the intent to cause confusion, mistake, or deception.

96. As a direct and proximate result of Masters' infringing activities, Optiv is entitled to and seeks Masters' unlawful profits, and damages from sales or contracts for services that were entered into during Masters' use of the Infringing Mark.

97. Masters' acts of infringement commenced and have continued in spite of Masters' knowledge that the use of the Infringing Marks or substantially similar variations thereof (such as "OPTIon") was and is in contravention of Optiv's rights and Optiv's logo marks.  Maters' ongoing infringing actions constitute bad faith and willful and intentional infringement, entitling Optiv to treble damages, which Optiv seeks herein.

98. Masters' infringement constitutes an exceptional case entitling Optiv to Optiv's attorneys' fees, which Optiv seeks herein.

99. Masters' conduct has caused, and if not enjoined, will continue to cause, irreparable harm to Optiv and Optiv's logo mark.

**PRAYER FOR RELIEF**

WHEREFORE, Optiv requests the following relief:

1. a judgment that Optiv's logo mark has been infringed by Masters in violation of Optiv's rights under federal law;

2.  a judgment that Masters' activities are likely to dilute Optiv's distinctive logo mark in violation of Optiv's rights under federal law;

3.  a judgment that Masters, and any company he may be working for, within 30 days after service of the judgment demanded herein, be required to file with this Court and serve upon Optiv's counsel, a written report under oath setting forth in detail the manner in which Masters has complied with the judgment;

4.  a judgment that Masters be required to conduct an accounting for any profits attributable to Masters' illegal acts;

5.  a judgment that Optiv recover from Masters Optiv's damages and lost profits, and Masters' profits, in an amount to be proven at trial, as well as treble, enhanced and/or exemplary damages under federal law, plus pre- and post-judgment interest;

6.  a judgment that Optiv be awarded reasonable attorneys' fees and costs incurred to enforce Optiv's rights in this action; and

7.  a judgment that all other relief to which Optiv may be entitled be awarded to it and any other relief this Court deems just and proper.

8.  a judgment that Masters and Masters' agents, employees, attorneys, successors, assigns, affiliates, principles, parents, subsidiaries and joint venturers, and any person(s) in active concert or participation with any of them, and/or any person(s) acting for, with, by, through or under any of them, be enjoined and restrained during the pendency of this action and thereafter permanently from:

> a) selling, offering for sale, advertising or promoting any services in connection with any words or symbols that so resemble the Infringing Mark so as to be likely to cause confusion, mistake or deception, on or in connection with any

17

services that are not authorized by or for Optiv, including, without limitation, any services in connection with the Infringing Mark which is the subject of this complaint, or any other approximation of Optiv's logo mark;

b) using any word, term, name, symbol, device or combination thereof that causes or is likely to cause confusion, mistake or deception as to the affiliation or association of Masters or Masters' services with Optiv;

c) further infringing the rights of Optiv in and to Optiv's logo mark or otherwise damaging Optiv's goodwill or business reputation;

d) further diluting Optiv's logo mark;

e) publishing or otherwise disclosing Optiv's trade secret and Confidential Information, including, but not limited to, the identification of Optiv's customers; identification of current and former Optiv employees; use of quotes by current of former Optiv employees; and Optiv's user interface and customer portals; and

f) continuing to perform in any manner whatsoever any of the other acts complained of in this complaint;

9. a judgment that Masters breached the Master Subcontract and the NDA when he disseminated and published Optiv's confidential and trade secret information.

## JURY DEMAND

Optiv requests trial by jury.

## DESIGNATION OF PLACE OF TRIAL

Optiv requests Denver, Colorado as the place of trial.

18

Respectfully submitted,

POLSINELLI PC

By: ___/s/ *Robert J. Hingula*___
    ROBERT J. HINGULA (KS #22203)
    ISAAC T. CAVERLY (D. Kan 78968)
    900 W. 48th Place, Suite 900
    Kansas City, MO 64112
    Telephone: (816) 753-1000
    Facsimile: (816) 753-1536
    rhingula@polsinelli.com
    icaverly@polsinelli.com

ATTORNEYS FOR PLAINTIFF

99812757.4